Mary E. ULLIUS, Plaintiff–Appellant,

v.

Dorinda D. ULLIUS, Defendant–
Respondent,

and

Kurt F. Ullius, Defendant.

No. 17261.

Missouri Court of Appeals,
Southern District,
Division Two.

Aug. 26, 1991.

William Icenogle, Icenogle & Icenogle, Camdenton, for plaintiff-appellant.

Cynthia N. Dunbar, Noland & Associates, P.C., Camdenton, for defendant-respondent.

SHRUM, Presiding Judge.

The plaintiff Mary Ullius appeals after the trial court declined to impose an equitable lien on real estate formerly owned

by her son, the defendant Kurt Ullius, and now owned by Kurt's former wife, the defendant Dorinda Ullius. We affirm.

## FACTS

Kurt Ullius bought Lot 7, Cave View Estates, in Camden County on June 1, 1987. He intended to build a house on the lot for resale. Although he was married to Dorinda at the time, he took title in his name only.

In his testimony, Kurt described his mother Mary as "a silent partner, the main investor." Kurt and Mary testified that they agreed that Mary would advance the money for Kurt to build a house on Lot 7 and, when the property was sold, Mary would be repaid her money plus interest with any profit belonging to Kurt.

Mary provided approximately $50,000, most of it coming from the proceeds of certificates of deposit. Dorinda was present at the bank when at least one of the certificates was cashed and the proceeds deposited into Kurt's Uptown Construction Company account. Mary did not obtain a deed of trust as security for the loan. An additional $31,000 needed to build the house was borrowed from a bank with repayment secured by two deeds of trust on Lot 7. The bank notes were signed by Kurt, Dorinda, and Mary. Dorinda wrote some checks on the construction company account to pay material suppliers.

There was testimony that Mary and Kurt intended that Mary have a security interest in the property:

Q. (To Kurt) Was it your understanding that your mother was to have a security interest in the house on Lot 7, Cave View Estates?

A. Yes, sir.

. . . .

Q. (To Mary) And did you look to this house as security for what you had advanced?

A. Yes, I did.

. . . .

On cross-examination, Mary was asked:

Q. So you gave [the money] to [Kurt] with the understanding from him he would repay?

A. The house to be security for my money that I put in it.

There was no such unequivocal testimony that Dorinda intended Mary have a security interest or that she knew of the existence of a security interest. Mary testified that Dorinda was "in on the discussions" that Mary would provide construction money, Kurt would build the house, and Mary would be repaid with interest when the house was sold. However, asked if Dorinda ever agreed to repay the money advanced to Kurt, Mary replied, "That was never discussed. . . . She was reaping part of the benefits from it." Neither Kurt nor Mary was specifically asked if Dorinda had agreed that Mary was to have a security interest in the property, and no specific inquiry was made of Kurt or Mary about whether Dorinda knew that Mary was to have a security interest.

Dorinda denied that she agreed "to any kind of lien on this property. . . ." Nevertheless, she admitted being present during conversations between Kurt and Mary regarding construction of the house, and she said she knew Mary was to be repaid when the house was sold. On cross-examination, she testified:

Q. (To Dorinda) Were you present during any conversation between Kurt and Mrs. Ullius regarding construction of this house?

A. We had different conversations at our kitchen table. Yes.

Q. And do you deny that Mrs.—from those conversations, that Mrs. Ullius was to be repaid when the house was sold.

A. I have always acknowledged that. I acknowledged that even whenever I filed for divorce. That there was monies involved in the house that I was living in.

Q. Of her money, which—

A. That's right.

Q. —she would be repaid when it was sold?

A. That there was money that was involved in the house was hers.

. . . . .

Q. So what I'm getting at, at the time of your divorce, you knew that Mrs. Ullius had money in this house?

A. That's right.

Q. Yeah. Which was her money?

A. Right.

Dorinda was never specifically asked if she knew Mary was to have a security interest in Lot 7.

On August 8, 1989, the marriage of Kurt and Dorinda was dissolved. As of the date of dissolution, the house was completed but not sold and neither the bank nor Mary had been repaid. The marriage was dissolved pursuant to a default decree which awarded Dorinda Lot 7, subject to encumbrances. This action by Mary to impose a lien on the property was filed September 21, 1989. Mary's claim to a $65,000 lien included accrued interest.

The trial court entered judgment in favor of Mary and against Kurt in the amount of $60,899. The court refused to impose an equitable lien on Lot 7. Mary appeals from the portion of the judgment denying her request for a lien. Kurt does not appeal.

## SCOPE OF REVIEW

█ Our review of this court-tried case is governed by Rule 73.01(c) as construed in *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). We are to sustain the trial court judgment unless there is no substantial evidence to support it, or it is against the weight of the evidence, or it erroneously declares or applies the law. *Id.* at 32. The phrase "weight of the evidence" means its weight in probative value, not the quantity or amount of evidence.

The weight of the evidence is not determined by mathematics; it depends on its effect in inducing belief. *Johnson v. Gregg*, 807 S.W.2d 680, 685 (Mo.App.1991). The trial court, functioning as a fact-finder, resolves conflicts in the evidence and can draw all reasonable inferences from the evidence presented to it and can base its ultimate findings upon such reasonable inferences. *In re Marriage of Hughes*, 773 S.W.2d 897, 898 (Mo.App.1989).

## DISCUSSION AND DECISION

In her first point on appeal, Mary contends the trial court judgment is against the weight of the evidence. She points specifically to trial court findings 5 and 6 which she claims are erroneous. For the sake of brevity and clarity, we paraphrase those findings as follows:

(5) There is not sufficient evidence to find that Dorinda Ullius was a party to or acquiesced in an agreement that Mary would have a security interest in Lot 7.

(6) Dorinda Ullius knew nothing of the agreement or business arrangement of Kurt and Mary.[1]

█ For an equitable lien to be imposed, there must be (1) a debt, duty, or obligation owed by one person to another; (2) a res to which that obligation fastens, one which can be identified or described with reasonable certainty; and (3) an intent, expressed or implied, that the property serve as security for payment of the debt or obligation. *Hartog v. Siegler*, 615 S.W.2d 632, 639 (Mo.App.1981), citing *Wilkinson v. Tarwater*, 393 S.W.2d 538, 542 (Mo.1965), and *Pine Lawn Bank and Trust Company v. Urbahns*, 417 S.W.2d 113, 117 (Mo.

1. In a court-tried case, when a party so requests, Rule 73.01(a)(2) requires the court to prepare a brief opinion stating the grounds for its decision and shall, if requested by counsel, include findings on controverted fact issues specified by counsel. We find no request in the record for an opinion by the trial court or for specific findings of fact.

Nevertheless, the trial court, as permitted by Rule 73.01(a)(2), made findings and entered them on the docket sheet. Although certain aspects of the trial court's findings, including those paraphrased in the text of this opinion, appear to be unsupported by substantial evidence and erroneously apply the law, they do not constitute reversible error. A correct decision will not be disturbed by an appellate court because the trial court gave a wrong or insufficient reason for the decision. *Edgar v. Fitzpatrick*, 377 S.W.2d 314, 318 (Mo. banc 1964); *Fesperman v. Silver Dollar City, Inc.*, 796 S.W.2d 384, 387–88 (Mo.App.1990). Although some of the trial court's reasoning might not coincide with ours, we will not disturb its decision because we have concluded the decision is correct. *In re Estate of McMorrow*, 720 S.W.2d 400, 402 (Mo.App.1986).

App.1967). Equitable liens "consist of personal obligations of landowners which equity enforces against the land and which follow the land until they reach those of a purchaser for value without notice." *Pine Lawn Bank,* 417 S.W.2d at 116.

■ We need not engage in a lengthy examination of whether the three-fold requirements for an equitable lien, as set out in *Hartog,* are satisfied,[2] for we have concluded the evidence supports a finding that, at the time of the dissolution decree, Dorinda did not know Mary and Kurt intended that Mary have a security interest in Lot 7. Thus Dorinda was "without notice," *Pine Lawn Bank,* 417 S.W.2d at 116, and the trial court correctly declined to impose the lien as requested by Mary.

■ The record is clear that Dorinda knew that Kurt obtained money from Mary to build the house and that the money was to be repaid with interest when the house was sold. An equitable lien cannot, however, be based only upon a moral obligation; it must find a basis in established equitable principles. *Hahn v. Hahn,* 297 S.W.2d 559, 565 (Mo. banc 1957). One such principle, that equitable lines may be established against third parties who have notice, is restated in *Pine Lawn Bank:*

> Indeed, there is generally no difficulty in equity in establishing a lien ... wherever there is a matter of agreement, at least against the party himself and third persons who ... have notice; for it is a general principle of equity that as against the party himself, and any claiming under him ... with notice, such an agreement raises a trust....

417 S.W.2d at 116.

We find no testimony from Kurt, Mary, or Dorinda that Dorinda knew Kurt and Mary had agreed that the house was to stand as security for the loan. This aspect of the case distinguishes it from *Jenni v. Gamel,* 602 S.W.2d 696 (Mo.App.1980), which is relied on by Mary. In *Jenni* the appellate court determined there was suffi-

cient evidence that the subsequent purchaser of the real estate had actual and constructive knowledge of an unrecorded deed of trust on the subject property. *Id.* at 701.

Mary argues that Dorinda's own testimony establishes her knowledge of a security interest in favor of Mary. We disagree. In *Hahn,* 297 S.W.2d 559, the supreme court considered evidence which it summarized as follows:

> In essence, then, her [the party seeking to impose an equitable lien] testimony is that her husband promised to repay her the amount she advanced and if not paid sooner she would be paid *when* the property was sold or, perhaps most favorably to her claim of equitable lien, that he would see that she got her money back "out of the sale of the house."

*Id.* at 565 (emphasis in original). Concerning the above summarized evidence, the supreme court stated:

> "A mere expectation, or even an agreement, that a debt will be paid out of a particular fund, a mere promise by a debtor to pay a debt out of a particular fund due him, as soon as he receives it, and a promise to pay a certain debt out of the proceeds of the sale of certain property have been held, respectively, not to be a sufficient appropriation to create a lien thereon."

> The construction we place upon the words of the agreement in evidence is that they were designed to fix the ultimate time for repayment of the advances made by Mrs. Hahn. They were not intended to pledge or appropriate the proceeds as security for the payment of the amount so advanced.

*Id.* at 566, *quoting* 33 Am.Jur. *Liens* § 20 (*see* 51 Am.Jur.2d *Liens* § 29 (1970)).

In the case before us, the trial court could have construed Dorinda's testimony as evidence that she knew when Kurt's debt to his mother was due. However, Dorinda's knowledge of the existence of

---

**2.** Thus we do not treat certain issues such as whether Mary had to show that Dorinda had agreed to repay the money advanced to Kurt or whether a lien could be imposed absent agree-

ment or acquiescence by Dorinda. Given our disposition of this case, evidence about those matters is relevant only as it relates to the issue of Dorinda's knowledge of a security interest.

the loan from Mary and when and how the loan was to be repaid, coupled with Dorinda's involvement in the construction of the house by paying suppliers' bills, did not compel the trial court to impute to her knowledge of Kurt and Mary's agreement that the property was to serve as security for the loan. We find no error in the trial court's refusing to impose a lien on the property after it had been transferred to Dorinda pursuant to the dissolution decree.

In her second point on appeal, Mary challenges one of the reasons the trial court gave for its decision to not impose an equitable lien on Lot 7. As we have stated, *supra* note 1, our primary concern is the trial court's decision, not the reasons it gave for its decision.

We affirm.[3]

FLANIGAN, C.J., and MAUS, J., concur.

---

**3.** Dorinda's request for damages for frivolous appeal pursuant to Rule 84.19 is denied.