

# IN THE MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

|  |  |  |
|---|---|---|
| DEVELOPER SERVICES CORPORATION, | ) ) | |
| Appellant-Respondent, | ) | |
| v. | ) ) | **WD75051** (consolidated with WD75081) |
| TRIPLE J. CONSTRUCTION, INC., et al, | ) ) | **FILED: April 8, 2014** |
| Respondents, | ) ) | |
| BAZIN EXCAVATING, INC., | ) | |
| Respondent-Appellant. | ) | |

### Appeal from the Circuit Court of Platte County
### The Honorable Owens L. Hull, Jr., Judge

### Before Division Four: James E. Welsh, C.J., Alok Ahuja, J., and Edith Messina, Sp. J.

This appeal involves the priority of various liens against a large tract of property in Platte County. The circuit court granted summary judgment finding that a contractual lien for real-estate broker's commissions claimed by Developer Services Corporation ("DSC"), and a mechanic's lien claimed by Bazin Excavating, Inc., were unenforceable. DSC and Bazin appeal. We affirm.

### Factual Background

Triple J Construction, Inc., a Kansas corporation owned and operated by Douglas Bohi, purchased the Platte County property at issue, comprising approximately 248 acres, in October 2004. Prior to Bohi's purchase, the property was partially owned by William Johnson, a real-estate broker. Bohi was a real-estate developer who had developed a number of other

subdivisions. Bohi's company purchased the property with the intention of developing a residential subdivision.

On October 14, 2004, Triple J borrowed $1,755,000 from Union Bank to purchase the property. Triple J granted Union Bank a first-priority Deed of Trust encumbering the property in exchange for the purchase-money loan. On the same day, Triple J transferred a portion of the property ("Phase 1") to Greenhills Development, LLC. Greenhills Development granted Union Bank a Deed of Trust encumbering Phase 1 in exchange for a $6,722,000 loan, which it used to purchase and develop the property. Bohi was an owner and managing member of Greenhills Development.

In the latter part of 2004, William Johnson and another real-estate agent, Cecilia Shalz, contacted Bohi about forming an in-house brokerage group to market and sell the subdivision property. Bohi agreed, and the three formed DSC, with each holding a one-third interest in the company.

In January 2005, DSC entered into an "Exclusive Subdivision Property Listing and Agreement," (the "Listing Agreement") with Triple J. With respect to DSC's compensation for providing brokerage services, the Listing Agreement provides:

> COMMISSIONS: Developer shall assure that Master Broker and/or Brokerage Firm shall receive from Approved Builders in the subdivision a commission equal to 6% for each sale of improved Subdivision Property. Developer shall require all builders and lot purchasers to comply with the requirements of this agreement and shall require all Approved Builders in the subdivision to sign listing agreements approved by Master Broker and Brokerage Firms.

The Listing Agreement gave DSC exclusive rights to market the property from January 30, 2005 through January 30, 2014. The Listing Agreement was signed by Bohi (acting for Triple J as the property's developer), and by Johnson for DSC.

2

The original plan called for the subdivision to be developed in three separate phases with approximately 1,000 homes to be built. In the early part of 2006, before any houses had been constructed, Bohi was approached by Signature Quality Homes, LLC about purchasing a portion of the property and becoming the exclusive builder for that portion of the property. Johnson spoke with both Bohi and Signature about DSC's right to commissions on property sales within the land to be sold to Signature. Bohi and Signature agreed that the Purchase Agreements conveying two separate portions of the subdivision property to Signature would include provisions recognizing DSC's right to commissions on the ultimate sale of subdivided property. The provision included in each Purchase Agreement reads:

> Purchaser and Seller acknowledge existing Marketing Agreement between Seller and Developer Services Corporation a copy of which is attached hereto and incorporated herein for all intents and purposes as Exhibit C and which shall be recorded in the form of an affidavit of Equitable interest in the Office of the Recorder of Deeds for Platte County, Missouri. Purchaser and Seller agree that any amendments, mutual agreements, changes, cancellations or terminations of Exhibit C agreement for any reason between Triple J Construction and Developer Services Corporation shall not affect the agreement between Developer Services Corporation and Purchaser or Prudential-Carter-Duffy Realtors[1] as set out in this Purchase Agreement and its Exhibits. Further Purchaser acknowledges that Developer Services will retain (1) percent of the gross sales price of any improved property sold within [the affected property].

The Purchase Agreements were signed on March 15, 2006. Bohi signed on behalf of Greenhills Development and Triple J as sellers.

In July 2006, DSC recorded its "Affidavit of Equitable Interest" with the Platte County Recorder of Deeds. The Affidavit of Equitable Interest states that

> THE UNDERSIGNED GIVES NOTICE, that Developer Services Corporation . . . entered into an agreement with Triple J Construction, Inc., a Kansas Corporation on January 17, 2005, regarding [the property]. The

---

[1] Prudential-Carter-Duffy Realtors was an entity which had entered into a sub-listing agreement with DSC. This type of sub-listing agreement was expressly contemplated by the Listing Agreement.

aformentioned tract of land has been platted under the names of Genesis Crossing Subdivision, Genesis Place Subdivision, Genesis Place Estates Subdivision, Genesis Trails Subdivision, and Genesis Village Subdivision.

THE PURPOSE OF THIS AFFIDAVIT is to give notice to the world that Developer Services Corporation has an interest arising from said agreement with Triple J Construction, Inc. in the tract of land aforementioned. Further, the purpose of this affidavit is to specifically give notice to all Real Estate Agents, Brokers, Title Insurance Companies, Mortgage Companies and others of Developer Services Corporation's interest.

The Affidavit of Equitable Interest does not describe in any fashion the nature of DSC's "agreement with Triple J Construction," or of DSC's rights under that agreement.

Triple J deeded the remainder of the subdivision property which it owned to Greenhills Development in August 2006. Greenhills Development borrowed $4,674,000 from Union Bank to finance the purchase, which permitted Triple J to pay off its debt to Union Bank. Greenhills modified the deed of trust it had given to Union Bank in October 2004, to cover the entire property.

Bazin's mechanic's lien claim stems from an oral contract it entered with Triple J in June 2005, to perform work and supply labor and materials for the construction and improvement of the subdivision. Bazin commenced work on the property immediately. Billing and payment for the work was to be done on a rolling account. Triple J stopped paying monthly invoices submitted by Bazin in April of 2006. Bazin, however, continued to perform work on the property through 2008. On August 20, 2008, Bazin filed a mechanic's lien statement in the Circuit Court of Platte County, asserting a lien on the property.

Also in 2008, Union Bank declared a default on its deed of trust and initiated a trustee sale for two separate portions of the subdivision property. The trustee sale was scheduled for October 10, 2008. On October 3, 2008, DSC sued Union Bank and M&I Bank (which we refer to collectively as "Union Bank") for breach of contract, quiet title, and judicial foreclosure of a

4

claimed lien against the property; it also named as defendants a number of additional parties (including Bazin) with an interest or potential interest in the property. The trustee sale under Union Bank's deed of trust went forward despite DSC's pending claims. Both Phase 1 and Phase 2 of the subdivision were purchased by Bannister Realty at the trustee sale. DSC added Bannister as a defendant on October 27, 2008. On December 1, 2008, Bazin asserted crossclaims, including a crossclaim for enforcement of its mechanic's lien.

Union Bank moved for summary judgment against both DSC and Bazin, arguing that neither DSC nor Bazin held valid liens against the property. Union Bank's motions were granted. Following the resolution of additional claims which are not relevant to the issues on appeal, both DSC and Bazin appealed from the circuit court's rulings against them.[2]

**Analysis**

**I.**

We first address DSC's claims. Although DSC asserts multiple Points on appeal, all of its claims depend on the contention that the Listing Agreement and Purchase Agreements granted DSC a consensual contractual lien on the subdivision property. Our conclusion that the documents on which DSC relies did not create a contractual lien is sufficient to dispose of DSC's appeal.

As noted above, the Listing Agreement which DSC entered with Triple J provided that DSC "shall receive from Approved Builders in the subdivision a commission equal to 6% for

---

[2]     Union Bank moved to dismiss the appeals, arguing that the notices of appeal filed by DSC and Bazin are untimely, and that we therefore lack appellate jurisdiction. The motion to dismiss is denied. Although the circuit court entered a judgment on September 28, 2011, which granted the motion of DSC and certain defendants to voluntarily dismiss their claims, defendant Valley View Bank, which had asserted its own counterclaim, did not join in the motion to dismiss, and its counterclaim was therefore not addressed by that judgment. A stipulation for dismissal without prejudice of Valley View Bank's counterclaim was not filed until March 6, 2012. DSC timely filed its notice of appeal on March 16, 2012. Pursuant to Rule 81.04(c), the filing of DSC's notice of appeal gave each other party ten days in which to file their own notices of appeal. Bazin filed its notice of appeal on March 23, 2012.

each sale of improved Subdivision Property." While the Listing Agreement specifies DSC's right to a 6% commission on certain sales transactions, however, it says nothing concerning the manner in which DSC's commission rights would be enforceable; in particular, the Listing Agreement says nothing concerning DSC's rights to a lien on the property, or on the sale proceeds, as security for any commissions it earned.

The Purchase Agreements acknowledge the existence of the Listing Agreement, contain Signature's agreement to DSC's receipt of commissions, and provide that DSC may record the Listing Agreement "in the form of an affidavit of Equitable interest." Thus, the Purchase Agreements recognize DSC's right to commissions and contemplate DSC's recording of a notice of the Listing Agreement. Nothing in the Purchase Agreements, however, purports to enlarge upon the substantive rights granted to DSC in the Listing Agreement itself, or grant DSC a security interest in the property. Thus, once again, while the Purchase Agreements may recognize DSC's right to the receipt of compensation in the form of broker's commissions, nothing in the Purchase Agreements indicates that DSC's compensation rights would constitute a lien against the property.

Contracting parties may impress real property with a lien to secure the payment of a debt. To do so, however, "a clear intention must be established to charge the land for personal obligations." *Pine Lawn Bank & Trust Co. v. Urbahns*, 417 S.W.2d 113, 116 (Mo. App. 1967). "For an equitable lien to be imposed, there must be . . . an intent, expressed or implied, that the property serve as security for payment of the debt or obligation." *Ullius v. Ullius*, 814 S.W.2d 321, 323 (Mo. App. S.D. 1991).[3]

---

[3]    *See also* Stephen Dean Streiker, *Getting Paid Commissions: A New Power Balance between Real Estate Brokers, Appraisers and their Clients under the Missouri Commercial Real Estate Brokers' and State Certified Real Estate Appraisers' Lien Act*, 63 UMKC L. REV. 727, 734-35 (1995) ("Missouri common law . . . limits the creation of equitable liens to those parties who have a clear

A failure to repay money as agreed, standing alone, is not a sufficient reason for equity to intervene to decree an equitable lien.

. . . .

In order to create an equitable lien by agreement, it is essential that the property or fund sought to be charged be distinctly appropriated to or as security for the payment of the debt or other liability in question. A mere expectation, or even an agreement, that a debt will be paid out of a particular fund, a mere promise by a debtor to pay a debt out of a particular fund due him, as soon as he receives it, and a promise to pay a certain debt out of the proceeds of the sale of certain property have been held, respectively, not to be a sufficient appropriation to create a lien thereon.

*Hahn v. Hahn*, 297 S.W.2d 559, 565-66 (Mo. banc 1957) (citation and internal quotation marks omitted). *Hahn* held that a husband's promise to his wife that he would pay a debt owing to her out of the proceeds of the sale of their home, when the home was sold, did not establish an equitable lien. The Court concluded that the husband's promises were merely "designed to fix the ultimate time for repayment of the advances made by" wife, but "were not intended to pledge or appropriate the proceeds as security for the payment of the amount so advanced." *Id.* at 566.

In this case, the documents on which DSC relies do not contain a clear indication that Triple J agreed to grant DSC a lien against any of the property, or against the proceeds of any sale of that property, to secure DSC's right to collect its broker's commissions. The various agreements establish DSC's right to compensation, and make clear that DSC's compensation rights accrue at the time a parcel of property is sold. The fact that the agreements establish a monetary obligation owing to DSC, and were "designed to fix the ultimate time for [ ]payment"

---

agreement that a particular property is to be charged for a specific debt."; generally, real-estate brokers are entitled to a common-law lien "only when created explicitly by prior agreement").

7

to DSC, *id.*, is not sufficient to establish a lien in specific property to secure that payment obligation.[4]

In the absence of a lien created by the Listing Agreement and Property Agreements, the parties' briefing addresses only one other potential source of a lien in DSC's favor: Missouri's Commercial Real Estate Brokers' and State Certified Real Estate Appraisers' Lien Act, §§ 429.600 to 429.630[5] ("CREBLA"). CREBLA creates an automatic broker's lien on commercial real estate,[6] provided that the broker meets the requirements of the statute. CREBLA requires that the broker record a lien notice within the time specified in § 429.609, and provide a copy of the notice to the property owner by certified mail. § 429.614. The statute provides that

> [a] lien notice, for purposes of sections 429.600 to 429.627, shall state the name of the claimant, the name of the owner, a description of the property upon which the lien is being claimed, the amount for which the lien is claimed, and the real estate license number of the real estate broker. The notice of lien shall be signed by the real estate broker and the broker shall attest that the information contained in the notice is true and accurate as to his knowledge and belief.

---

[4]    DSC's counsel acknowledged at oral argument that there is no evidence in the record that Greenhills Development, Triple J or Signature reviewed or approved the form of the affidavit DSC filed; DSC does not argue that the affidavit itself creates a lien in DSC's favor.

[5]    Statutory citations refer to the 2000 edition of the Revised Statutes of Missouri, updated through the 2013 Cumulative Supplement.

[6]    CREBLA defines "commercial real estate" as:

> any real estate other than real estate containing one to four residential units or real estate classified as agricultural and horticultural property for assessment purposes as provided by section 137.016. Commercial real estate shall include any unimproved real estate of any zoning classification, other than agricultural or horticultural real estate, being purchased for development or subdivision. Commercial real estate does not include single-family residential units including condominiums, townhouses or homes in a subdivision when such real estate is sold, leased or otherwise conveyed on a unit-by-unit basis even though the units may be part of a larger building or parcel of real estate containing more than four residential units

§ 429.603(1). The parties do not address whether the commission rights DSC seeks to enforce relate to the sale of "commercial real estate" as defined in this provision. Given that DSC is not entitled to a lien under CREBLA for the reasons discussed in the text, we need not separately address the issue.

8

§ 429.607. "The real estate broker's lien is void if the broker does not record the lien as provided in sections 429.600 to 429.627." § 429.614. The statute also specifies (with an exception not relevant here) that "the broker claiming such lien must commence proceedings within six months after recording the lien," and that "failure to commence proceedings within the six months shall extinguish the lien." § 429.616.

DSC filed its Affidavit of Equitable Interest on July 3, 2006; it filed its lawsuit to enforce its lien nearly two-and-a-half years later on October 3, 2008. DSC's purported lien notice (the Affidavit of Equitable Interest) did not contain the real estate license number(s) for Johnson or Shalz, or the amount for which the lien was claimed, as required by § 429.607. DSC concedes that if CREBLA applies to its claim, its failure to meet the statute's timing and notice requirements would prevent it from enforcing its broker's lien. Given our conclusion that DSC has no *contractual* right to a lien to secure its broker's commissions, and its concession that it cannot successfully assert a lien under CREBLA, the circuit court's grant of summary judgment on DSC's claims must be affirmed.[7]

## II.

We next address Bazin's arguments. Bazin asserts that the trial court erred in granting summary judgment to Union, preventing Bazin from enforcing a mechanic's lien against the property. We find one issue to be dispositive: Bazin's failure to comply with the notice requirements in § 429.012.1.

Section 429.012 requires "[e]very original contractor" to provide a written notice to the property owner, or to the person with whom the contractor contracted, "prior to receiving

---

[7] At oral argument DSC's counsel argued that, even if the summary judgment granted against it were affirmed, Union Bank was not entitled to foreclose on the property because of defects in the legal descriptions contained in the Bank's deed of trust, and because the Bank had allegedly recorded a release of its deed of trust, which it later attempted to withdraw. Those arguments were not raised in DSC's briefing, and we do not address them.

payment in any form of any kind from such person." The form of the notice is prescribed by § 429.012.1.

> This notice provision requires original contractors to provide specific notice to the party with whom the contract for work was made before bringing suit. The purpose of the notice provision is to warn inexperienced property owners of the danger to them which lurks in the mechanics' lien statute. Where a petition and proof fail to establish such notice, there is no cause of action alleged or proven and the lien is null and void. Through our courts have required strict compliance with this provision and been reluctant to allow exceptions other than those provided for under the statute, we have found substantial compliance with the statute where the facts so required.

*Bellon Wrecking & Salvage Co. v. Rohlfing*, 81 S.W.3d 703, 713 (Mo. App. E.D. 2002) (citations and internal quotation marks omitted).[8]

Bazin acknowledges that it did not provide the "original contractor" notice required by § 429.012.1. It argues, however, that it is not an "original contractor" subject to § 429.012.1. We disagree.

Missouri courts have held that an "original contractor" for purposes of § 429.012.1 is "[o]ne who makes a contract to perform labor or furnish materials with the then owner of the property . . . ." *Kenny's Tile & Floor Covering, Inc. v. Curry*, 681 S.W.2d 461, 471-72 (Mo. App. W.D. 1984) (quoting *Vasquez v. Village Center, Inc.*, 362 S.W.2d 588, 593 (Mo. 1962)). "Thus, determination of a lien claimant's status as an original contractor is typically a simple matter. The court identifies the record owner at the time of the contract in question and decides whether the lien claimant contracted with the owner." *Morgan Wightman Supply Co. v. Smith*, 764 S.W.2d 485, 489 (Mo. App. E.D. 1989).

---

[8] The notice requirements applicable to subcontractors are markedly different. *See* § 429.100 (subcontractor must give notice to owner at least ten days before lien is filed); § 429.080 (lien must be filed within six months after last labor is performed or last materials furnished).

"Original contractor," as defined in the statute, is not synonymous with the familiar term "general contractor." All that is required to render a contractor an "original contractor" is that it contract directly with the property owner; the contractor is deemed to be an "original contractor" even if the property owner is acting as its own "general contractor" on a particular project. *See*, *e.g.*, *Home Bldg. Corp. v. Ventura Corp.*, 568 S.W.2d 769, 771 (Mo. banc 1978) (although contract between property owner, which was building housing units on property, and contractor "referred to them as contractor and subcontractor respectively," "[t]hat characterization is not necessarily determinative" of contractor's status as an "original contractor"); *Kenny's Tile*, 681 S.W.2d at 471-72 (where owner was acting as a general contractor, court found that subcontractors which contracted directly with the owner were "original contractors"); *J.R. Meade Co. v. Forward Const. Co.*, 526 S.W.2d 21, 25-26 (Mo. App. Ct. 1975) (owner of property was a construction company functioning as a general contractor; "[w]e are mindful . . . that [deeming all tradespeople who contracted with property owner to be 'original contractors'] produces all original and no subcontractors. This in no way offends the purpose of the statute and the fact that this result is unusual does not require a change in the underlying definition of 'original contractor.'").

Here, Bazin contracted with Triple J, which owned at least a significant part of the relevant property at the time of contracting. Under the cases discussed above, it is irrelevant whether Triple J was acting as a general contractor for purposes of determining Bazin's status as an "original contractor." Because it is undisputed that Bazin contracted with the property owner, it is an "original contractor" under § 429.012.1, and is subject to the notice requirements found there. Bazin's mechanic's lien accordingly fails.

11

Bazin emphasizes that it had a long relationship with Bohi, Triple J's principal, and had worked with him on ten-to-twelve prior subdivisions. Based on their prior relationship, and Bohi's considerable development experience, Bazin argues that Bohi presumably knew that Bazin had the right to file a mechanic's lien, and therefore "under the circumstances involved in this development, there was no purpose to be served by the giving of notice." Bazin also notes that in Missouri, "the mechanic's lien statute is remedial in nature, enacted to provide protection for those who make improvements to real property and should be as liberally construed as the circumstances allow." *In re Trilogy Dev. Co.*, 468 B.R. 854, 874 (Bankr. W.D. Mo. 2011) (citations omitted).

Bazin's failure to comply with § 429.012.1 cannot be excused based on the general remedial purpose of Missouri's mechanic's lien statutes, and Bazin's claim that there was no need for the "original contractor" notice in the particular circumstances of this case. As the Eastern District explained in a case in which the appellant made similar arguments:

> [P]laintiff contends the lien law should be liberally construed in favor of those who perform work and provide materials and that technical non-compliance should not defeat the lien. This argument implies there is something to construe; there is not. The statute requires the notice to owner and makes it a condition precedent to creating the lien. The language is plain and unambiguous and requires no construction. The burden is on plaintiff to show compliance with the statutory prerequisites to create the lien. The plaintiff has not made reasonable and substantial compliance with the statute, rather it is in total non-compliance with a mandated condition precedent to the creation of its liens.
>
> . . . [P]laintiff suggests that because of its past relationship with [Respondent] there was no prejudice to that owner. Prejudice or harm is not required. Lack of prejudice to the owner does not relieve plaintiff from being in substantial compliance with the mechanic's lien statutes.

*R. J. Stephens Drywall & Painting Co. v. Taylor-Morley-Simon, Inc.*, 628 S.W.2d 374, 375 (Mo. App. E.D. 1982); *see also*, *Morgan Wightman Supply*, 764 S.W.2d at 493-94 (rejecting argument

12

that liberal construction of mechanic's lien statute could override specific notice requirements of § 429.012.1).

Finally, Bazin notes that Triple J only owned *part* of the property at the time Bazin contracted with it, because it had transferred a portion of the property ("Phase I") to Greenhills Development on October 14, 2004. Bazin argues that "the property not within Phase 1 should be considered as surplusage and stricken from the lien, leaving Bazin's lien on Phase 1 intact."

As Bazin notes, there is precedent holding that, if a lien statement describes both lienable and nonlienable property, the reference to the nonlienable property may be treated as surplusage; in that case, a court may enforce the lien as to that part of the described property which is lienable. *See*, *e.g.*, *Dave Kolb Grading, Inc. v. Lieberman Corp.*, 837 S.W.2d 924, 939 (Mo. App. E.D. 1992) (citing *R.E. Sanders v. DeWitt*, 579 S.W.2d 707, 712 (Mo. App. W.D. 1979)). Where work was performed on *both* the lienable and nonlienable property, however, the court must be able to separate out the value of the work performed on the nonlienable property in order to treat the erroneous inclusion of that property in the lien statement as surplusage. We made this clear in *Lake Ozark Construction Industries, Inc. v. Osage Land Co.*, 168 S.W.3d 471 (Mo. App. W.D. 2005), which also involved a lien statement which identified both lienable and nonlienable property. We explained:

> The issue of what work was performed as to what property goes to the requirement of § 429.080 that the lien statement contain a "just and true account of the demand due." In that regard, it is well settled in the law that a "lien statement may be regarded as 'just and true' [in accordance with § 429.080], so as not to vitiate the entire lien, if the inclusion of a non-lienable item is the result of honest mistake or inadvertence without intent to defraud and if the non-lienable items can be separated from the lienable items." *Sears, Roebuck & Co. v. Seven Palms Motor Inn*, 530 S.W.2d 695, 698–99 (Mo. banc 1975). Hence, the fact that in excluding, as surplusage, the language in the appellants' lien statement concerning the non-contiguous lots, the statement of the account due the appellants would be rendered inaccurate, due to a demand for work performed on non-lienable property, would not work to vitiate the entire lien, unless Golf

13

Trust's motion established with undisputed facts that the appellants intended to defraud Golf Trust or that the non-lienable items could not be separated from the lienable items. In that regard, the summary judgment record discloses that Golf Trust did not allege any such facts in its motion. Hence, there is nothing in the summary judgment record from which the trial court could have granted summary judgment to Golf Trust on Count IV based on the appellants' failure to include in their lien statement a just and true account of their demand on the subject property.

*Id.* at 478-79 (other citations omitted).

In this case, Bazin's counterclaim alleged that it contracted with Triple J to perform work on the *entire* subdivision property on which it asserted a mechanic's lien, and Bazin has acknowledged that the work it performed was not limited to the Phase 1 property purchased by Greenhills Development on October 14, 2004. Moreover, in its summary judgment motion, Union Bank specifically alleged as an undisputed fact that "Bazin does not allege what part of its work was on Phase I or Phase II, the hours spent or the materials or equipment used on each Phase." Bazin responded:

Deny. Most of the invoices specifically reference Phase 1, which was the only work being done on the project at the time. (See Bazin's invoices attached to the Mechanic's Lien filed August 20, 2008.) The only Phase 2 work was some work on Genesis Trails, which Bazin was paid in full on. The invoices specifically discuss the work that was performed and where it was performed.

The only evidentiary support for Bazin's denial of Union Bank's statement of undisputed fact was the invoices attached to its mechanic's lien statement. Those invoices, however, do not support Bazin's assertions. While three invoices identify the relevant project as "Genesis Crossing Phase 1," most of the invoices attached to the lien statement identify the relevant project with the generic and all-encompassing description "Genesis @ Green Hills." In addition, neither the invoices themselves, nor the documentation supporting the invoices, provide any further description of the property with respect to which the work was performed. Moreover, *none* of the documentation related to Bazin's 2008 work – the work that is essential to the

14

timeliness of Bazin's lien filing – identifies any particular location for the work that was performed. At oral argument, Bazin's counsel acknowledged that it cannot be determined on the existing record whether the 2008 work was performed on Phase 1, or elsewhere on the property.

In this case Union Bank's motion for summary judgment expressly argued that Bazin had contracted to perform work with the owner of (at least part of) the relevant property, and that Bazin was therefore an "original contractor." Union Bank specifically alleged, as an undisputed fact supporting the grant of summary judgment, that Bazin had failed to distinguish between work it performed on property which Triple J owned at the time of contracting, *versus* work performed on property owned by Greenhills Development. Although Bazin purported to dispute this factual assertion, it failed to do so effectively, since the documentation on which it relies actually proves Union Bank's point: it is impossible to determine from the lien statement and invoicing documentation what portion of Bazin's work was performed on property owned by Greenhills Development in June 2005, as to which an original contractor's statement under § 429.012.1 would have been unnecessary.

Bazin's lien statement described both lienable and nonlienable property, sought to recover for work on both the lienable and nonlienable property, and provided no basis for the court to determine what portion of the work was performed on the lienable property. In these circumstances, the trial court could not have treated Bazin's description of nonlienable property as mere surplusage, and enforced Bazin's lien as to the remainder of the property, and the remainder of the work. The trial court correctly held that Bazin's failure to serve the notice required by § 429.012.1 was fatal to its effort to enforce a mechanic's lien.

**Conclusion**

The circuit court's judgment is affirmed.

15

_____
Alok Ahuja, Judge

All concur.